Matter of Maurer (2025 NY Slip Op 50290(U))

[*1]

Matter of Maurer

2025 NY Slip Op 50290(U)

Decided on March 6, 2025

Surrogate's Court, Monroe County

Ciaccio, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on March 6, 2025
Surrogate's Court, Monroe County

In the Matter of the Judicial Settlement of The Estate of Georg R. Maurer, decedent.

Index No. 2021-2779/B

Christopher S. Ciaccio, S.

Tevis Maurer is the executor of the Estate of her father Georg R. Maurer, and she has brought a petition to judicially settle the account.
The decedent's daughter, Samantha Maurer, is a residuary legatee, and she appeared on the return date without an attorney and expressed her opposition to the accuracy of the account. She filed no written objections. Nonetheless, the court scheduled a hearing, finding that the legatee's oral statements established a material issue of fact regarding the accuracy of the account.
The hearing was held on February 13, 2025. Samantha Maurer testified, as did the executor, Tevis Maurer. Exhibits were marked and received. Petitioner offered the following exhibits:
1 — the Petition with schedules
2 - 29 photographs depicting the condition of the estate household
3 - M & T Bank Universal Withdrawal slip
4 - M & T Bank Official Check, payable to Samantha Maurer
All were received.
The Respondent Samantha Maurer offered the following:
A — M & T Bank "EZ Choice Checking" statement for period dated April 22, 2021 — May 21, 2021, account of "Georg R. Maurer ATF Samantha Maurer 121 Oak Bridge Way Rochester, NY 14612" with a beginning balance of $4574.11 and ending balance of zero dollars.
B — M & T Bank "MyChoice Money Market" statement for period Feb. 20 — May 21, 2021, account of "Georg R. Maurer ATF Samantha M. Maurer, 121 Oak Bridge Way, Rochester, NY 14612," with a beginning balance of $76, 361.25 and ending balance of zero dollars.
C- M & T Bank "Official Check" in the amount of $26,979.46 payable to Melody Gould, dated 6/28/2021.
D - M & T Bank "Official Check" in the amount of $26,979.46 payable to Tevis Maurer, [*2]dated 6/28/2021. 
E — M & T Bank statement for account of "Samantha M. Maurer, 1400 Fletchers Lane, Caledonia, NY 14428," for period April 27, 2021 — July 27-2021, showing a deposit of $94, 996.54, a debit of $53,958.92, and an ending balance of $41,039.11.
All were received.
What follows are the Court's Findings of Fact based upon the testimony and other evidence it finds credible and accurate, and its Conclusions of Law.
FINDINGS OF FACT
Georg R. Maurer died on March 3, 2021, survived by three daughters. Tevis Maurer and Melody Gould were born of the marriage to his first wife, and daughter Samantha Maurer was born of his second marriage. 
His Will left his estate equally to his three daughters.
Daughter Tevis was the nominated executor in the Will, and she was issued letters on 4/18/22.
The decedent's probate estate consisted of a house at Oak Bridge Way, Rochester, New York (previously owned by decedent's father) and some personal property, including a trailer in South Carolina, in which he had lived with his daughter Samantha. The decedent and Samantha left the trailer and moved into the house at Oak Bridge Way shortly after decedent's father passed away.
Samantha continued living in the house after her father died.
Decedent had maintained an account as trustee for Samantha at the M & T Bank. The title of the account, as reflected on a statement (Respondent's Exhibit B), was "Georg R. Maurer ATF Samantha Maurer, 121 Oak Bridge Way, Rochester, NY 14612. The court takes judicial notice that in banking parlance, "ATF" translates into "As Trustee For."
Tevis, as executor, allowed Samantha to remain in the house, with the understanding that Samantha would apply for a mortgage and purchase the house at a set price equivalent to an appraisal or fair market value, and use the proceeds to pay her sisters their one-third shares.
Samantha's mortgage applications ultimately were not finalized. One in particular, through Rocket Mortgage, was set to close but fell through at the last minute. Tevis then moved to eject Samantha from the house and arrange for its sale. Samantha was evicted on 9/23/24. The house was sold for $194,000.00.
Tevis visited Samantha in the house on several occasions, the last one being June of [*3]2022. At that time the house did not appear to have been damaged or in a state of disrepair.
Regarding the M & T Bank account, the sisters convinced Samantha, shortly after the decedent's passing, that their father had intended the money to be split equally, so M & T opened an account in Samantha's name only, poured the proceeds of the trust account into her account ((Respondent's Exhibit "E"), then had Samantha sign a withdrawal slip for two-thirds of the amount (Petitioner's Exhibit "3"). It then issued two bank drafts (Respondent's exhibit "C" and "D"), one to each sister, in the amount of $26,979.46 each (one-third of the money from the decedent's account). Bank officers signed the drafts. Samantha for her part did not understand that "ATF" meant that she was the owner of the proceeds from the account once her father died, or that he had placed the money "in trust" for her.
The court finds, as part of its findings of fact, that Samantha was coerced under duress into handing the money over to her sisters, and that the bank aided and abetted what was a wrongful transfer of funds.
Once Samantha was removed from the house, Tevis entered and found the house had been damaged and was in a state of disrepair. Flooring had been removed, revealing sub-flooring. There were holes in walls. Kitchen hardware was missing from cabinets. Appliances were in the basement. Trash and debris were scattered around the house. Dog feces covered the basement floor. Urine stains were noticeable. Windows were damaged.
Samantha was responsible for some of the damage. She had been attempting renovations. She moved the appliances. She cut holes in walls where she wanted to install shelving. She allowed a boyfriend to reside with her. He was abusive and she was able to get him to leave. He had numerous pets. Some of the damage was caused by her father and grandfather when they lived there.
Tevis filed a petition for judicial settlement. It reported principal received as follows: $21,000 for a truck; $10,025.00 for the trailer and personal property; and $194,265.96 for the proceeds of the house sale.
She offset Samantha's share of the Estate for "property repairs" as detailed in the Petition (Petitioner's Exhibit 1), Schedule C-2 — "Administration Expenses Chargeable to Income" shows "Total Property Repairs" in the amount of $26,020.27, chargeable to the distributive share of Samantha Maurer. 
Of that amount an even $25,000.00 was attributed to "Contractor Repairs." A list of items repaired was provided in Schedule C-2. Following a statement of the amount, the schedule says, "See attached," but no attachment is provided that breaks down the charges by item let alone contains receipts.
An additional $1020.27 was attributed to miscellaneous costs, flea bombs, cleaning supplies etc. Again, no receipts are provided.
Chargeable to the Estate are expenses totaling $13,495.75. Most expenses relate to maintenance of the property at 121 Oak Bridge Way but also included are expenses attributed to travel expenses for the executor (and her sister) to go to South Carolina to attend to the clean out and sale of the trailer there.
The total for travel is $2802.40. 
Schedule A-2 - "Income Collected" - shows rent due from Samantha for the time she lived at Oak Bridge Way, in the amount of $36,790.00 representing nearly 22 months at $1700 per month. This amount is also a set-off from Samantha's distributive share.
CONCLUSIONS OF LAW
The account is adjusted as follows:
The house repair fee is reduced by 50 percent, to $13,010.35 because 1) the amount claimed is undocumented, 2) some of the damage was caused by the father and grandfather, and 3) the executor as fiduciary failed to oversee and maintain the condition of the house, as was her responsibility, considering that it was the only substantial estate asset. She made a visit in June 2022, and not again until after financing fell through and ejectment proceedings began. A surcharge will not be applied for her neglect in failing to oversee the condition of the house, but it could easily have been justified and imposed.
To the extent the Estate can produce receipts and proof of payments, the balance - $13,010.35 — shall be an expense of the estate.
The monthly rental amount, reflected as income, is disallowed. The amount purportedly charged was the product of an entirely hearsay opinion of a realtor and is not considered. That testimony is deemed stricken. Moreover, as the sisters inherited equally, they were de facto tenants in common, and so long as Samantha did not prevent them from using the house (there is no testimony that she did), she cannot be charged for rent (see In re Owens' Estate, 36 Misc 2d 1031, 1032-33, 234 NYS2d 495 [Sur Ct 1962]).
Here, there was no explicit rental agreement and no demand for payment until the Petition was filed (as in Owens). Based on the credible testimony the court finds there was an implicit agreement that Samantha could remain in the house rent-free while she attempted to secure a mortgage. Nothing was said between Samantha and the executor regarding rental payments.
All other expenses are deemed reasonable, including legal fees, executor's commission, filing fees, utilities and maintenance, payment to Jacqueline Maurer, funeral expenses, and executor travel expenses, which the court finds are reasonable and were incurred in the discharge of fiduciary duties.
All other charges related to maintenance of the Oak Bridge property and the trailer are reasonable.
From a net total of $200739.00, an additional $13,010.35 is deducted for repairs, leaving $187,728.65.
The net amount is then divided three ways, each share equaling $62576.21. The amount of $13,010.35 is deducted from Samantha's share and withheld by the Estate, so that her share is $49,565,86.
Remaining is the issue of the funds in the trust account at M & T Bank. A surrogate has broad powers of equity and discretion, especially regarding an accounting (see Matter of Stortecky v Mazzone, 85 NY2d 518, 525, 650 NE2d 391 [1995]: "we conclude that the Surrogate's power to initiate an examination of the items on an account before approving them is reasonably to be implied from the Constitution, the statutes and the case law." 
An argument can be made (however flimsy and supported only by inadmissible hearsay) that the money should have passed into the estate because the father's intent (so two of the sisters believed and the third sister, Samantha, reluctantly as well) was that the money should be distributed equally when he died. As it is not reflected in the accounting, the omission would make the accounting inaccurate, but the net result would be the same if it was amended, since the three sisters split the money equally.
But the only admissible evidence of the decedent's intent was the account title, which signifies that it is a classic Totten trust — money held in trust for another.
A Totten trustborn a century ago in Matter of Totten (179 NY 112 [1904])  is essentially an account which the depositor holds "in trust for" or "as trustee for" another person, the beneficiary. The trust may be revoked during the lifetime of the depositor by withdrawal of the funds or other affirmative acts, but if the depositor predeceases the beneficiary without revoking the trust, the beneficiary takes the balance of the funds at the time of the depositor's death without the funds passing through the depositor's estate. The account, in effect, is an alternative testamentary disposition.
Eredics v Chase Manhattan Bank, N.A., 100 NY2d 106, 109-10, 790 NE2d 1166 [2003]
If Georg Maurer needed help with management of the account, he could have added Samantha's name as a joint account holder. But he did not. It may be that he wanted an account structure that insured that Samantha would not be able to remove any funds from the account — but he surely did not name his other daughters as additional beneficiaries.
Nor was there any revocation of the Totten trust during Georg's lifetime, which can be accomplished in three ways, as provided for at EPTL 7-5.2 (see also Eredics v Chase Manhattan Bank, N.A., 100 NY2d 106, 110-11 [2003])
One is by the depositor during his lifetime making withdrawals against the account.
The second is by stating an express revocation of the account in the depositor's Will, [*4]which to be effective must name the account and the financial institution.
Three, the depositor could execute a writing, acknowledged in the same way as a deed, and deliver it to the financial institution.
"Absent such measures, the trust would terminate on a depositor's death and title to the funds remaining in the account would vest in a surviving beneficiary free and clear of the trust" (Eredics v Chase Manhattan Bank, N.A., 100 NY2d 106, 110-11 [2003], citing EPTL 7-5.2 [4]).
None of these events occurred during Georg's lifetime.
To bring the trust funds back into the hands of Samantha, the trust beneficiary, on the ground that she was coerced into making (what is in reality) a gift to her sisters, a conclusion that is not hard to draw given that in her testimony Samatha seemed to be a weak-willed person easily overborne, overwhelmed and influenced, does she need to bring a supreme court proceeding (because it would be a dispute between living parties that does not involve estate assets or estate matters)?
The answer is, in this instance, yes. As much as the court would like to see the facts play out in a more involved proceeding, properly pleaded, and with an opportunity, if justified, to fulfill its mandate to protecting orphans, it cannot turn this accounting proceeding into an action in replevin or trover regarding assets outside of the estate.
Counsel for the Estate shall file an amended accounting and Decree consistent with the findings above.
Dated: March 6, 2025
Rochester, New York
Hon. Christopher S. Ciaccio
Surrogate